

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| LEONARD N. BARSODY | ) | |
| | ) | |
| vs. | ) | CIVIL ACTION NO. 3:21-cv-91 |
| | ) | |
| CLEARFIELD AREA SCHOOL | ) | COMPLAINT |
| DISTRICT | ) | JURY TRIAL DEMANDED |

The Plaintiff, LEONARD N. BARSODY, *pro se*, as under 28 U.S.C. § 1654, complains as follows against the Defendant, CLEARFIELD AREA SCHOOL DISTRICT:

**NATURE OF COMPLAINT**

1. This is a proceeding for declarative relief and damages for violations of the Plaintiff's rights under the Americans with Disabilities Act, 42 U.S.C. § 12111 et seq. (ADA). The Plaintiff qualifies as an individual with a disability, due to having a previous medical record of such an impairment which affected his major life activities, according to ADA, 42 U.S.C. § 12102. The Plaintiff contends that the Defendant had intentionally created a hostile work environment and had engaged in multiple actions of employment discrimination against the Plaintiff. The Defendant had also failed to properly acknowledge, address, and resolve actions of discrimination and unlawful harassment by employees of the Defendant to permit the return of the Plaintiff to the workplace. When the Plaintiff's employee status was changed to Unpaid Leave, the Plaintiff filed a letter of resignation for his constructive termination from employment on May 3, 2021, citing a hostile work environment and irreconcilable differences.

## JURISDICTION AND VENUE

2. Plaintiff, LEONARD N. BARSODY, a former employee of the CLEARFIELD AREA SCHOOL DISTRICT, resides in Curwensville, a town located in Clearfield County.

3. Defendant is located at 2831 Washington Ave, Clearfield, PA 16830.

4. Pursuant to 28 U.S.C. § 1391, venue is properly located at the U.S. Courthouse in Johnstown, PA within the Western District of Pennsylvania because the Defendant is located within said judicial district.

5. Pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1343, this Court has jurisdiction over the actions carried out by the Defendant's alleged violations of Title I of the ADA, 42 U.S.C. § 12111 et seq, and relief sought by the Plaintiff, according to 28 U.S.C. § 2201-2202 and 42 U.S.C. § 1981a.

## PARTIES

6. Plaintiff, LEONARD N. BARSODY, is a lifetime citizen of the United States and resident within the state of Pennsylvania.  Plaintiff was a highly-qualified physics teacher at the Clearfield Area Jr./Sr. High School, who had been employed by the Defendant since August 2014 until recently.

7. Defendant, CLEARFIELD AREA SCHOOL DISTRICT, is a midsized, rural, public school district.  The Defendant employs approximately 350 employees annually, which is comprised of about 200 teachers and about 150 full-time and part-time support personnel.

## ADMINISTRATIVE PROCEEDINGS

8. On December 14, 2020, the Plaintiff filed the *first* employment discrimination complaint inquiry with the United States Equal Employment Opportunity Commission (EEOC), concerning the Plaintiff's placement on Paid Directive Administrative Leave on October 29, 2020. Following a phone interview on February 23, 2021, an EEOC Charge of Discrimination, EEOC 533-2021-00429, (Exhibit 1) was filed and the Plaintiff received a Dismissal and Notice of Rights (Exhibit 2). The filing of this civil action is timely within the 90 days of receipt of the notice provided to the Plaintiff.

9. On March 13, 2021, the Plaintiff filed the *second* discrimination complaint inquiry concerning an IME "Fitness for Duty" Evaluation directive provided by the Defendant on November 13, 2020. The phone interview for the second complaint is currently scheduled for June 14, 2021.

## STATEMENT OF CLAIM
## PRIOR TO 2020-21 SCHOOL YEAR

10. On multiple occasions, during 2012 and 2013, the Plaintiff was admitted into the psychiatric ward unit at the Warren General Hospital in Warren, PA. On January 18, 2013, during his second admission into the psychiatric ward unit, the Plaintiff signed a form to designate his father as his agent in Power of Attorney. Additionally, during 2012 and 2013, the Plaintiff experienced various time periods of unemployment, and also, various time periods of short-term employment, which were due to ongoing issues concerning his mental health. These facts qualify the Plaintiff as having a disability under ADA, 42 U.S.C. § 12102.

11. On November 12, 2014, the Plaintiff transferred behavioral health outpatient services to Universal Community Behavioral Health Outpatient Clinic, then located at 190 Match Factory Place, Bellefonte, PA 16823.   The Plaintiff's primary purpose for receiving services was to maintain prescription drug refills that helped him maintain a normal work/sleep cycle in his daily life.   Around June of 2017, the Plaintiff began to ween himself off of medications with the approval of his therapist over an approximate duration of one year, prior to being released from treatment and services on June 8, 2018 upon his own request and his therapist's approval.   The services were covered using the Plaintiff's employer-offered group health insurance plan, Highmark BCBS.   As of the current date of this writing, research conducted by the Plaintiff revealed that the said clinic closed its office at this location around Feb 1, 2020.

12. Over a time period from 2016 to the current date of this complaint, the Plaintiff was targeted and victimized by various acts of harassment, according to PA Title 18 § 2709(a), and with various frequencies of occurrence.   Most acts of harassment occurred within the local community and surrounding areas where the Plaintiff's resides by numerous individuals unknown to the Plaintiff, as well as some employees and students of the Defendant.

13. The primary method of most acts of harassment was usually done in an attempted covert manner to mitigate the accountability on the part of the harasser, specifically, making remarks at the Plaintiff's back usually as he walks by the harasser in public venues or vice versa, and when no or few potential witnesses are in near physical proximity. This method prevents the immediate identification of the harasser.   However, on some occasions, the Plaintiff clearly and immediately identified the harasser when the harasser was physically

positioned at the Plaintiff's side, about 3 or 9 o'clock, within the Plaintiff's field of vision, where the Plaintiff observed the harasser's mouth physically move to state the verbal remark, which sometimes included the physical head motion of the harasser to be directed toward the physical position of the Plaintiff, despite the body position of the harasser being oriented differently than their head. Therefore, these acts of harassment are real to the Plaintiff and not imagined as some individuals have previously suggested. The remarks are almost always stated in a normal, everyday tone of voice and they vary in their degree of severity of communicated message, from trivial to the suggestion of terroristic threats, according to PA Title 18 § 2706(a)(1). Some past examples include "You're girlfriend is cheating on you", "You have mental health issues", "You're going to get beat up", "You're going to get hit", "You're going to get shot", "We're going to put some lead in your act", "I'm going to purple-heart you and blow your head off", "Your whole family is going to get shot and killed." The number of acts of harassment against the Plaintiff is estimated to be at least a couple hundred or so over the said time period and with various degrees of frequency.

14. The Plaintiff managed his response to harassment and other events of ill-intent (e.g., when an individual loosened the lug nuts on the wheels of the Plaintiff's vehicle) in various ways. These methods included ignoring the harasser's remarks, sharing these experiences with other individuals, educating other individuals on methods employed by harassers, challenging the harasser through direct questioning to no or trivial response, making physical approach toward the harasser to observe and act upon their counter-response, and making a few reports to various law enforcement agencies.

15. The Plaintiff determined that the overall objective of these acts of harassment and others is to create an adverse and stressed psychological state in its victim through indirect instigation in order to elicit an unfavorable response by the victim to make the victim cause self-ruin of themselves by their own actions in response, as the Plaintiff has yet to experience any acts of direct confrontation and/or physical assault.   This adverse psychological state can be short-term or long-term in duration, depending on the frequency of the harassment.   The Plaintiff suggests two possible extrema of the victim's psychological state may occur, the victim becomes desensitized to the harassment or the victim falls into a state of psychological crisis.

16. On a few occasions, when the Plaintiff experienced many acts of harassment over a duration of a few days or weeks, and made the observations that different individuals at different venues state the exact same verbal remark, the Plaintiff, by using direct evidence, concluded what the Plaintiff already knew, that a group of individuals have premediated their actions and have engaged in criminal conspiracy, according to PA Title 18 § 903. Such remarks include "You're girlfriend is cheating on you" over the time period from October to December 2019 within the Clearfield Area Jr./Sr. High School and surrounding community, and "You're going to get hit" over the time period from November to December 2020 at various locations between Clearfield, PA and DuBois, PA.

17. Beginning in 2018, similar acts of harassment and other acts of harassment against the Plaintiff were now occasionally occurring within the workplace of the Plaintiff.   The Plaintiff determined that some employees and some students of the Defendant who have engaged in such acts of harassment must know the other individuals within the community who are unknown to the Plaintiff and who have also engaged in acts of harassment against

the Plaintiff, as the same exact verbal remark is made to the Plaintiff, as described in Paragraph 16.

18. The Plaintiff alleges that some employees of the Defendant knew of the Plaintiff's previous medical history concerning his mental health, which served as their motive concerning their acts of harassment and other actions of harm against the Plaintiff in his career and personal life.  The Plaintiff believes that employees of the Defendant attempted to make it appear to other individuals that the Plaintiff currently suffers from mental health issues.

19. The Plaintiff made only a few reports to the high school administration and teacher union concerning acts of alleged harassment and employee conflict within the workplace.  This was due to the following reasons:

    1.  Many acts of harassment were of a sensational nature whose believability would be of question when reported and not worthwhile.

    2.  In most instances, no easily retrievable objective evidence existed (e.g., a received email), and therefore, conclusion drawn from an investigation would likely result in a useless he-said-she-said mode of argumentation, despite the Plaintiff's knowing of the facts of truth.

    3.  In the cases where retrievable objective evidence existed, its investigation required technological resources beyond the Plaintiff's own means (e.g., surveillance video footage), a significant investment of time, and was still prone to loopholes (e.g., there was evidence of an interaction between two people in surveillance video footage, but the exact words used in the verbal remark remains elusive and defensible).

    4.  Some of the employees held positions within the high school administration or teacher union.

20. Around early Spring of 2020, due to the elements of a hostile work environment, the Plaintiff considered seeking a new teaching position in a different geographic location.  At the conclusion of this search, the Plaintiff determined that this will likely have more severe consequences for the Plaintiff's personal life and career, which include a likely salary reduction, non-ideal geographical location, non-ideal teaching position and curricula, and others.  The Plaintiff concluded that the best course of action was to remain in his current teaching position at Clearfield Area Jr./Sr. High School during the 2020-21 school year.

21. Consequently, the Plaintiff acted to acquire near-complete documentation of the Plaintiff's employee records and personal emails.  On May 22, 2020, the Plaintiff sent an email to Kim Davis, Clearfield Area Jr./Sr. High School Secretary, to request a copy of all contents within his employee personnel file.  The Plaintiff received a copy of the personnel file about one week later from Missy Pollock, Human Resources Secretary.

## STATEMENT OF CLAIM
## 2020-21 SCHOOL YEAR

22. Due to the COVID-19 pandemic, to commence the 2020-21 school year, the Defendant provided specialized policies for students and faculty, which included a hybrid learning student attendance policy, in order to promote a safer learning environment for students and within the CDC's recommended guidelines for public health and safety.  30  A specific policy document of relevance later on and provided to all teachers stated the directive, "no sharing of materials by students."

23. At various times after the start of the school year, as the Plaintiff was in his classroom doing work alone, some employees of the Defendant engaged in acts of harassment against the Plaintiff as they walked in the hallway past the Plaintiff's classroom door, as described in Paragraph 13.  The Plaintiff would occasionally make loud remarks back in response, such as "What's wrong with you?"

24. As the beginning of the school year progressed, the Plaintiff observed that many students were struggling in completing their work and were failing physics.  The number of failing students was unlike anything the Plaintiff had experienced in previous years.  Other teachers with whom the Plaintiff discussed student achievement with also noted similar observations in their courses.

25. Around mid-September, Eric Scaife, Clearfield Area Jr./Sr. High School Assistant Principal, who also led collaboration with teachers among the Science Department and was in his first complete school year of employment in his position, requested a meeting with the Plaintiff to discuss failing students in his course.  During this *first* meeting, Mr. Scaife noted that many parents called in with complaints concerning their son or daughter's achievement, but he did not specify which parents, nor any details of these complaints when asked by the Plaintiff.  The Plaintiff stated that he did not receive a single phone call from any parent concerning their son or daughter's academic achievement in his course. This was first time in the Plaintiff's career while employed by the Defendant that the Plaintiff ever received feedback concerning student academic achievement issues from an administrator. 31

26. In response, the Plaintiff made phone calls on September 14, 2020 and September 21 to the Pennsylvania State Education Association (PSEA) to speak to someone concerning the

elements of a hostile work environment at his place of employment of the Defendant. The
Plaintiff chose not to make a report to the Clearfield Education Association (CEA) teacher
union, which was due to many factors, specifically, some employees who had engaged in
acts of harassment against the Plaintiff and whom the Plaintiff had a prior documented
conflict with previously held key positions within the union.

27. On September 28, 4:56 PM, the Plaintiff received a phone call from Terri Moore, PSEA
UniServ Rep.  The Plaintiff shared candid details about the occasional hostile work
environment for the record.  The Plaintiff was advised to speak David Wright, CEA
President, and employee of the Defendant.

28. On Wednesday, October 14, the Plaintiff met Mr. Wright after school in his classroom to
provide awareness and discussion of issues in the workplace and outside the workplace
with other employees.

29. Around the same date as the meeting with Mr. Wright, the Plaintiff had a *second* meeting
with Mr. Scaife concerning progress on failing students.  In this meeting, the Plaintiff noted
his own solutions put into action to promote student academic achievement and his
subsequent observations of improvement among some students, his recognition of the large
number of students with exceptional academic achievement, and his recognition that *all*
failing students were failing two or more academic and elective courses, along with the
observation that percentage grades of these students in most of these other courses were
significantly lower than in his course.

30. On Monday, October 26, Mr. Scaife sent the Plaintiff an email that contained two
directives: (1) to include more hands-on labs in the second marking period, and (2) to lower
one of the grade weightings used in the determination of a student's percentage letter grade

for the first marking period.  In the Plaintiff's review that these directives were in conflict with beginning-of-year directives provided to all teachers by the high school administration and the Defendant, along with the Plaintiff's course syllabus concerning the method used in the determination of a student's grade; the fact, that the previous two meetings with Mr. Scaife were concerning for the Plaintiff to confidently perform his job duties without potential and undeserving repercussions; and other concerns regarding his employment, the Plaintiff requested another meeting with Mr. Scaife and union representation to discuss the given directives.  The Plaintiff desired a documented record to ensure the Plaintiff's confidence and protection to perform his job duties for the duration of the school year.  Mr. Scaife responded and set up the meeting for Tuesday, October 27, 9th period, with the following attendees: Mr. Scaife, Mr. Wright, and the Plaintiff.

31. Upon the Plaintiff's arrival to the October 27 meeting, the *third* meeting with Mr. Scaife, the Plaintiff noticed that Andrew Brickley, Clearfield Area Jr./Sr. High School Assistant Principal, and Heather Prestash, Clearfield Area Jr./Sr. High School Principal, were present for the meeting, despite not being included in the email to schedule the meeting.  This observation caused the Plaintiff some feelings of anxiety in a pressured environment.  Mr. Scaife and Mr. Wright were also in attendance.

32. At the beginning of the meeting, discussion was held concerning the email directives provided by Mr. Scaife.  Next, due to the presence of all high school administration, the Plaintiff felt that is was necessary at this time to provide a first disclosure of details concerning various acts of harassment against the Plaintiff for the awareness of the high school administration moving forward.  The Plaintiff's presentation was not ideal.  The Plaintiff shared some candid details concerning his personal life and spoke from a mixed

tone of feelings that included anger and frustration, which included the usage of cuss words on three occasions. The Plaintiff disclosed that similar acts of harassment against the Plaintiff, among other crimes and transgressions, happened in 2012 when he resided in the Pittsburgh area. When the Plaintiff used anger in his expression and statements, this anger was not directed at any individual within the meeting room, nor any individual within the school building, nor any other specific individual. The Plaintiff also disclosed the fact that he had suffered from severe and potentially life-threatening alcoholism back in 2012, but was now going on six years of sobriety as of the date of the meeting, stating his 6th year anniversary date, March 1, 2021. The Plaintiff disclosed the fact that these things were the major reasons for the Plaintiff to voluntary admit himself into the psychiatric ward unit in the Warren General Hospital in 2012. The Plaintiff returned to a calm demeanor after his presentation. Some high school administrators asked questions of the Plaintiff prior to the end of the meeting, which the Plaintiff answered honestly. There was even a moment of shared laughter near the conclusion of the meeting in response to a remark offered by Mr. Brickley in the somewhat awkward environment created by the Plaintiff.

33. On Wednesday, October 28, the Plaintiff attended work and performed his job duties satisfactorily as usual. There was no supervision of the Plaintiff at work in his classroom during the school day by any member of the high school administration, nor was there a follow-up meeting with any member of the high school administration prior to the Plaintiff's departure from work. However, as the Plaintiff was working at his desk on his computer and alone in his classroom during 9th Period, a substitute teacher, who is also a retiree of the Defendant, engaged in an act of harassment against the Plaintiff, as described in Paragraph 13, when she was walking down the hallway and passed by the open doorway

of the Plaintiff's classroom.  This event would be later noted and detailed in a formal unlawful harassment complaint submitted by the Plaintiff, as objective evidence should exist in the form of camera surveillance video, the Plaintiff yelling back various statements to the coworker from his classroom desk that teachers in other nearby classrooms may have heard, and potential metadata that exists when the Plaintiff typed a paragraph of text in frustration in his Microsoft Outlook email program that was subsequently deleted after being typed and never sent to a recipient.  During this incident, the Plaintiff also physically left his seat at his desk, and from his classroom, he saw the coworker who he knew made the remark turn the corner in the hallway, yet the Plaintiff did not leave the classroom to confront the coworker to his suspected detriment and returned to his seat and desk to go back to work.

34. On the evening of October 28, the Plaintiff received a phone call from David Wright, CEA President, and Terri Moore, PSEA UniServ Rep, notifying the Plaintiff that he was to be placed on Paid Directed Administrative Leave beginning the next day, October 29.  The Plaintiff made statements on numerous occasions that he was able to perform his job duties satisfactorily and that he wanted to attend work the following day. *The Plaintiff was told that there was NO option for him to attend work the following day.*  The Plaintiff was given three directives: (1) submit lesson plans to Mrs. Prestash and Mr. Scaife, and then "cc" him (David Wright) in this email; (2) do not be present on school property; and (3) attend one counseling session prior to his return to work. **35**

35. At no time soon after the October 27 meeting or thereafter did the Defendant request a written statement from the Plaintiff.  Additionally, at no time soon after the October 27 meeting or thereafter did the Defendant issue a written statement to the Plaintiff concerning

his placement on Paid Directed Administration with the rationale and terms and conditions
to return to work.

36. At 10:26 pm on October 28, the Plaintiff sent Mr. Wright a SMS text message to request a
written statement from the Defendant concerning his placement on Paid Directed
Administrative Leave.

37. On Thursday, October 29, the Plaintiff did not attend work and began his time placed on
Paid Directed Administrative Leave.

38. On Friday, October 30, the Plaintiff sent Mr. Wright a SMS text message at 6:18 AM to
report that the Plaintiff is locked out of his school email account. At 7:19 AM, the Plaintiff
sent another SMS text message that he disagreed with being placed on Paid Directed
Administrative Leave, that it violates the employment laws enforced by the EEOC, and
that the Defendant has diagnosed him as having a mental health condition with their terms
and conditions of employment and with no medical authority to do so.

39. The Plaintiff successfully completed all three directives provided by Mr. Wright. The
Plaintiff submitted lesson plans for the remaining school days of the current week he was
placed on Paid Directed Administrative Leave and all school days during the following
week. Since an employee of the Defendant locked out the Plaintiff from his employee
computer accounts, including his school email, the Plaintiff used the email address,
"lennybarsodycasd@gmail.com", to submit his lesson plans. This alternative email
address served previously as the Plaintiff's professional email address while attending
professional development summer workshops, such as through Penn State's College of
Education CSATS and also made use of Google Classroom and other account-related
software resources. The Plaintiff was never present on school property at any time during

his placement on Paid Directed Administrative Leave. The Plaintiff promptly scheduled a counseling appointment with Erica States, licensed counseling therapist, of Christian Counseling Associates (CCA) located in DuBois, PA and attended the counseling session on November 3.

40. On Tuesday, November 3, the Plaintiff notified Amy Marshall, Esq., Pennsylvania State Education Association (PSEA) Attorney concerning the counseling session directive and included Erica States in this email correspondence. Previously, the Plaintiff was advised by Mr. Wright to contact Amy Marshall for assistance moving forward with the Plaintiff's employment scenario.

41. On Tuesday, November 3, the Plaintiff successfully completed all directives provided to him on the October 28 phone call by Mr. Wright. Consequently, the Plaintiff should have been promptly returned to work. However, this was not the case, and no further response of resolution was provided by Mr. Wright, nor the Defendant. Erica States provided verbal feedback to the Plaintiff that he appeared fine and did not appear in need of counseling for employment purposes.

42. The Plaintiff attended a second counseling session with Erica States on Tuesday, November 10 in an act of "good faith." The Plaintiff's attendance of this counseling session was promptly communicated to Amy Marshall of PSEA.                    36

43. Still having no communication from the Defendant regarding the Plaintiff's return to work, on Thursday, November 12, in an email correspondence sent to Mrs. Prestash, the Plaintiff requested a "written formal statement" concerning his employment scenario from the Defendant.

44. On Saturday, November 14, the Plaintiff received and signed for the formal statement from the Defendant sent via USPS Priority Mail Express.  The formal statement was dated, November 13, written and signed by Terry Struble, Superintendent of the Defendant.  Mr. Struble's formal statement issued a new and more severe directive that required the Plaintiff's completion of an Independent Medical Examination (IME) "fitness for duty" evaluation with a psychiatrist.  It was also stated concerning the Plaintiff's placement on Paid Directed Administrative Leave that, "This is not the result of a disciplinary concern, but is a concern for your overall health and well-being."  In Mr. Struble's formal statement, the legal basis of support for the issued IME directive is cited from 24 P.S. § 14-1418(c):

> "(c) School boards may require a special medical examination for any school employe at any time."

45. On Sunday, November 22, the Plaintiff sent Amy Marshall of PSEA an email that alleged that the Defendant engaged in employment actions against the Plaintiff that were discriminatory in nature according to employment laws and EEOC guidelines.  In that same email, the Plaintiff made a comparison of his expression of anger in the October 27 meeting to that of other employees of the Defendant that was previously seen first-hand by the Plaintiff.  In this regard, the Plaintiff noted that his expression of anger was "slight" and directed at no individual, while the expression of anger by other employees was "explosive" and directed at students.  In that same email, the Plaintiff makes allegations concerning acts by some employees of the Defendant to undermine his career.  Due to the recent IME directive and other unfavorable actions by the high school administration and

the Defendant, the Plaintiff now considered his employment scenario to be a more severe and lasting hostile work environment.

46. On Tuesday, November 24, Amy Marshall sent the Plaintiff an email correspondence that she is working on getting him back to school. On the same day, the Plaintiff responded that there are some concerns that first need addressed by the Defendant prior to his return to work. There was a series of email exchanges on the same day, yet no mention was made of the status of the Defendant concerning the Defendant's IME "fitness for duty" evaluation directive.

47. On Monday, November 30, a phone call discussion took place between Amy Marshall and the Plaintiff. The Plaintiff believed that his return to work under current employment conditions and written statements looked like a "set up" for the Plaintiff to be victimized by further consequences to himself in the future. The Plaintiff desired a written statement from the Defendant concerning the status of the IME directive, as well as addressing the issues concerning collective workplace harassment to ensure a safe return to the workplace. No such written statement was provided to the Plaintiff. The Plaintiff did not return to work at this time.

48. On Monday, January 4, 2021, the Plaintiff took initiative and sent an email to Mr. Struble to request additional information that was necessary to explore the completion of a valid and objective IME "fitness for duty" evaluation. The Plaintiff previously disagreed with the IME directive, and in this same email, inquired concerning the rationale for its issuance. To the best of the Plaintiff's knowledge at the time of this email, the only information provided to date to the Plaintiff or Amy Marshall was the basic information which was contained in the November 13, 2020 formal statement by Mr. Struble. The Plaintiff

received no response, and no new and additional information was provided to Amy Marshall of PSEA.

49. On Tuesday, January 19, the Plaintiff received an email from Amy Marshall that included a formal statement issued by Carl P. Beard, Solicitor of the Defendant, dated January 15, 2021. This statement provided an alternative option for resolution of the Plaintiff's employment scenario, which was impossible to complete based on previous statements by Erica States of CCA and her organization's policies. This statement also disclosed that if the requested information was not received "by the close of business Friday January 22, 2021", then the Plaintiff "will have to go onto paid sick leave or he can explore a sabbatical leave for restoration of health until such time that the letter and or report is received."

50. On Monday, February 1, the Plaintiff sent an email, titled "Policy 448 – Unlawful Harassment", to Mrs. Prestash that contained two formal complaints concerning two employees of the Defendant. Mrs. Prestash is responsible for investigating unlawful harassment, according to the Defendant's policy manual. On Wednesday, March 3, the Plaintiff sent an email and formal complaint concerning the *first* and *second* meetings with Mr. Scaife to Mr. Struble. On Friday, March 5, the Plaintiff sent an email to Mrs. Prestash concerning detailed events that involved numerous acts of harassment against the Plaintiff within the workplace, outside the workplace by employees of the Defendant and other individuals, and other various relevant events. There was a series of email exchanges and formal response statements by Mrs. Prestash and the Plaintiff. The Plaintiff noted many inconsistencies and questionable statements in these responses by Mrs. Prestash, which may be attributable to the individuals whom Mrs. Prestash received feedback and statements from during her investigation. The Plaintiff alleges that the issues concerning

collective unlawful workplace harassment were resolved poorly or remain unresolved, and
that the elements of a hostile work environment were fully established and evident in the
Plaintiff's complaints

51. On February 16, 2021, Erica States of CCA initiated an email that included Amy Marshall
of PSEA; Dr. Richard Hoffman, Ph.D., LPC of CCA, who would be potentially providing
services; and the Plaintiff. This chain of email correspondence concerned the IME "fitness
for duty" evaluation directive given to the Plaintiff by the Defendant. Amy Marshall of
PSEA noted that the Defendant will not provide further clarification regarding the IME.

52. The Plaintiff alleges that the Defendant, in their issuance of the November 13, 2020 formal
statement and IME directive acted in a retaliatory manner in response to the Plaintiff's
inquiry of his employment scenario in the November 12 email to Mrs. Prestash and other
individuals. The Defendant's lack of action over many months to provide further details
and rationale supports this claim.

53. In response, on March 8, 2021, the Plaintiff called OCD Spectrum, Inc. to inquire about
services to complete a secondary IME "fitness for duty" evaluation to serve various
purposes. These purposes include (1) that the background information and objective
assessment criteria offered by the Defendant to complete the IME "fitness for duty"
evaluation was insufficient and ill-defined by comparison, (2) possible litigation against
the Defendant, and (3) personal defense for the Plaintiff, when he finds and gains new
employment, and his previous employment scenario may become known to new employer.

54. On March 9, 2021, the Plaintiff emailed Dr. Joshua Riley-Graham, MD, PhD, a licensed
psychiatrist, of MSCIS, LLC, a company affiliated with OCD Spectrum, Inc. for intake to
receive services. OCD Spectrum, Inc. has two office locations: 307 Fourth Ave, 11th Floor,

Pittsburgh, PA, and 606 Washington Ave, Bridgeville, PA 15017. The IME "fitness for duty" evaluation is currently scheduled for May 15, 2021.

55. In another formal statement issued on April 1 by Mr. Struble, the Plaintiff was informed that his remaining sick days and personal days are "set to be exhausted on April 27, 2021."

56. When the Plaintiff's employee status was changed to Unpaid Leave, along with his loss of employee benefits, the Plaintiff decided to submit his letter of resignation as a constructive termination due to "hostile work environment" and "irreconcilable differences". This letter of resignation, dated Monday, May 3, 2021, was provided to Amy Marshall of PSEA by email in digital PDF format to provide to Carl P. Beard, Solicitor of the Defendant. This letter of resignation was also sent in hardcopy form by USPS Certified Mail to the address of the School Board of Directors, same as the Defendant, 2831 Washington Ave, Clearfield, PA 16830.

## CAUSE OF ACTION
## DISCRIMINATION IN VIOLATION OF ADA

57. The Plaintiff restates every statement in Paragraphs 1-56 of this complaint with full force and effect.

58. The Plaintiff has a previous record of a disability impairment, as in ADA, 42 U.S.C. § 12102(B).

59. The Plaintiff first disclosed his previous record of disability impairment to the administration of the Defendant in the October 27, 2020 meeting.                **41**

60. Under the ADA, the Plaintiff has the right to choose how he discloses information concerning his disability.

61. The Plaintiff alleges knowledge of his previous record of disability was known by the Defendant prior to the October 27, 2020 meeting.

62. The Plaintiff alleges knowledge of his previous record of disability was known by employees of the Defendant prior to the October 27, 2020 meeting.

63. The Plaintiff alleges that acts of unlawful harassment by employees of the Defendant are in violation of ADA, 42 U.S.C. § 12112.

64. The Plaintiff first disclosed various acts of harassment against the Plaintiff to the high school administration of the Defendant in the October 27, 2020 meeting.

65. The Defendant engaged in multiple adverse discriminatory employment actions in violation of ADA, 42 U.S.C. § 12112, which include hostile work environment due to collective unlawful harassment, retaliatory discrimination, and discriminatory terms and conditions of employment. The adverse discriminatory employment actions include:

   1. The Plaintiff's placement on Paid Directed Administrative Leave on October 29, 2020, when the Plaintiff was willing and able to perform his job duties.

   2. The Defendant's directive to complete one counseling session during Paid Directed Administrative Leave in order to return to work.

   3. The Defendant's directive to complete an IME "fitness for duty" evaluation with psychiatrist in the November 13, 2020 formal statement.

   4. The Defendant's failure to disclose requested and necessary information in a timely manner to properly complete IME "fitness for duty" evaluation, and consequential change of the Plaintiff's salary status from regular contract salary to exhaustion of sick time and personal leave by the Defendant on January 25, 2021.

66. The Plaintiff never posed as a "direct threat", as in ADA, 42 U.S.C. § 12111(3), to myself or to other individuals in the workplace at any time:

    A. during his employment prior to the October 27, 2020 administrative meeting,

    B. during said meeting, or

    C. after the said meeting, since:

        I.   the Plaintiff departed work in his normal manner and with no employment consequences or law enforcement involvement by the response of the Defendant, and

        II.   the Plaintiff attended work the following day, performed his job duties satisfactorily in his usual capacity, and departed work in his normal manner.

67. While on leave of absence, the Plaintiff submitted various complaints to the Defendant concerning unlawful harassment and other adverse actions by employees of the Defendant. The Defendant performed their investigation and provided a response to each complaint to the Plaintiff. The Plaintiff alleges that in numerous cases where objective evidence exists that the Defendant provided inaccurate details, whose factual legitimacy must be postponed until the discovery phase and various document production requests.

68. The Plaintiff submitted his letter of resignation after placement on Unpaid Leave due to a hostile work environment and irreconcilable differences, and this action should be considered a constructive termination.

        **43**

69. As a direct result of the Defendant's actions in violation of ADA, the Plaintiff has suffered damages to past wages; future wages, which include PSERS retirement pension and

lifetime earning capacity; employee benefits; character and reputation; and other consequential damages and expenses. Additionally, the Plaintiff has suffered emotional pain and suffering, inconvenience, and mental anguish due to the actions of the Defendant.

70. The Plaintiff has determined that his total loss of lifetime earning capacity through retirement to his projected life expectancy is likely to exceed $1,000,000 under various new employment scenarios and relevant retirement plans for which the Plaintiff is currently qualified based on his previous education and college degrees.

## **RELIEF**

71. Under 42 U.S.C § 1981a, the Plaintiff has right to recovery due to multiple acts of intentional discrimination by the Defendant.

72. The Defendant has more than 200 and fewer than 501 employees in each of 20 or more calendar weeks in the current or preceding calendar year, as in 42 U.S.C. § 1981a(b)(3)(C).

73. The Plaintiff seeks recovery of punitive damages due to discriminatory employment actions of malice and complete disregard by the Defendant.

74. The Plaintiff seeks recovery of actual compensatory damages, which includes lost wages, employee benefits, and all necessary litigation costs incurred.

75. The Plaintiff seeks recovery of general compensatory damages, which includes emotional pain and suffering, inconvenience, and mental anguish.

76. The Plaintiff seeks recovery for all damages excluded from the cap limit on the sum of compensatory and punitive damages, which include back pay, interest on backpay, and frontpay and other relief, as under Title VII § 706(g) and referenced for such relief in 42 U.S.C. § 1981a(b)(2).

77. The Plaintiff demands a trial by jury.

Dated: Curwensville, Pennsylvania
        May 13, 2021

*Leonard N. Barsody* (pro se)
Leonard N. Barsody
513 Thompson St
Curwensville, PA 16833
lennybarsody@gmail.com
(814)-761-1775

45